928 A.2d 795

**Robert Leo Donald SMITH, et al.**

v.

**Scott DANIELCZYK, et al.**

**No. 133, Sept. Term, 2006.**

Court of Appeals of Maryland.

July 25, 2007.

100

Clarke F. Ahlers, Columbia, for appellants.

Jordan V. Watts, Jr., Deputy Legal Counsel (Karen Stakem Hornig, Chief Counsel, Baltimore Police Dept. of Baltimore, George Nilson, City Solicitor, Baltimore City Law Dept. of Baltimore, on brief), for appellees.

Argued before BELL, C.J., RAKER, CATHELL, HARRELL, BATTAGLIA, GREENE, and ALAN M. WILNER, (Retired, Specially Assigned), JJ.

WILNER, J.

The principal issues in this case are what, if any, privilege or immunity police officers have (1) for making allegedly false defamatory statements in an application for a search warrant, and (2) for voluntarily disclosing those statements to the news media.[1] We shall hold that, to the extent they may apply under the particular factual circumstances, police officers have the common law qualified immunity enjoyed generally by public officials and the statutory protection afforded by the State Tort Claims Act or the Local Government Tort Claims Act, but that they do not enjoy any absolute privilege or immunity.

## BACKGROUND

On May 5, 2006, appellants, Robert Smith and Vicki Mengel, filed in the Circuit Court for Baltimore City a one-count complaint for defamation against Scott Danielczyk and John Jendrek, appellees. That complaint was dismissed on motion, with prejudice. Ordinarily, in reviewing the dismissal of a complaint on motion, we look only to the allegations in the

---

1. In this context, the terms "privilege" and "immunity" are often used interchangeably. To the extent there is a privilege, immunity from liability tends to follow.

complaint and any exhibits incorporated in it and "assume the truth of all well-pled facts in the complaint as well as the reasonable inferences that may be drawn from those relevant and material facts." *Ricketts v. Ricketts,* 393 Md. 479, 491–92, 903 A.2d 857, 864 (2006), quoting from *Porterfield v. Mascari II, Inc.,* 374 Md. 402, 414, 823 A.2d 590, 597 (2003); *see also Debbas v. Nelson,* 389 Md. 364, 372, 885 A.2d 802, 807 (2005).

Maryland Rule 2–322(c) provides, however, that if, on a motion to dismiss for failure of the complaint to state a claim upon which relief can be granted, "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 2–501 [which governs motions for summary judgment]." Rule 2–322(c) adds that, in that event, the parties "shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 2–501."

Three defenses were raised in the motion to dismiss, but they all fit, at least in a general way, within the ambit of an assertion that the complaint failed to state a claim upon which relief could be granted.[2] Although no extraneous material was attached to either the complaint or the motion to dismiss in this case, appellees made certain factual averments in the memorandum they filed in support of their motion and attached as exhibits to that memorandum copies of applications for certain search warrants, the warrants themselves, and an undated and unsigned document that purports to be a return identifying material seized pursuant to one of the warrants. In their response to the motion, appellants alleged additional facts that were not mentioned in the complaint.

██ Because the court dismissed the complaint without explanation, it is not clear whether any of that material was, in

---

2. Appellees' motion, as supplemented in their memorandum in support of the motion, sought to dismiss the complaint on the grounds that (1) the plaintiffs failed to comply and allege compliance with a statutory notice provision and, as a result, their claim was barred as a matter of law, (2) the defendants were immune from liability for defamation by reason of an absolute and qualified privilege, and (3) the complaint failed to set forth a prima facie case of defamation.

fact, considered. The record does not indicate that the extraneous documents or averments were "excluded" by the court, however, so we must assume that they *were* considered. Ordinarily, therefore, we would be obliged to treat the court's ruling as the grant of summary judgment for appellees and review it in that light. Under Maryland Rule 2–501(f), summary judgment may properly be entered only if "the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." In making that determination, all facts set before the court and all inferences that may fairly be drawn from those facts must be considered in the light most favorable to the non-moving party, in this case the appellants. *See United Servs. Auto Ass'n v. Riley,* 393 Md. 55, 66–67, 899 A.2d 819, 825–26 (2006); *Haas v. Lockheed Martin, Corp.,* 396 Md. 469, 478–79, 914 A.2d 735, 740–41(2007).

■ Regrettably, some of the relevant facts are not presented with the greatest clarity or even in the proper manner.[3] Because there seems to be no dispute regarding the extraneous material appended to appellees' motion to dismiss and none of the relevant factual averments by appellees in their memorandum or made by appellants in response to the motion were controverted, we shall regard the exhibits and the additional averments as simply supplementing the allegations in the complaint and consider the relevant facts pled in the complaint, as so supplemented. *See Pension Ben. Guar. Corp. v. White Consol. Ind.,* 998 F.2d 1192, 1196 (3rd Cir. 1993).

---

**3.** Facts that a party wishes a court to consider in deciding a motion should be set forth in the motion, in an attachment to the motion, or in a pleading or motion already before the court, not in a memorandum of law or a response to such a memorandum. A memorandum may properly discuss the relevant facts, but it is not the place to plead them. Moreover, having decided to add extraneous facts, not then part of the record, appellees were obliged to present those facts in an affidavit made on personal knowledge, which they did not do. Any new facts contained in a response by appellants also were required to be supported by affidavit.

Appellants Robert Smith and Vicki Mengel were Baltimore City police officers assigned to a seven-member "Flex Squad" in the Southwest District. Smith, a sergeant, was the supervisor of the squad. Mengel was an investigator. The Flex Squad came under scrutiny when a woman claimed that she had been raped by a police officer in the Flex Squad office.[4] On December 29, 2005, in furtherance of an investigation into the rape charge and pursuant to applications made by appellees, who were police officers assigned to that investigation, warrants were issued to search the office of the Flex Squad and certain lockers located in the office. In the execution of those warrants, which occurred at about 2:00 that same afternoon, controlled dangerous substances were discovered in a duffel bag under one officer's desk, in a second officer's desk drawer, and in a third officer's jacket pocket. On the wall of the office, a vial with white residue was discovered. No contraband was discovered from Smith or Mengel, who were not present at the office that day, or, apparently, from their desks, lockers, or other property.

Promptly after the search was conducted, appellees prepared an application for another warrant to search the Flex Squad office and various lockers and containers located there. It is the affidavit accompanying the application for that warrant that forms the basis of this lawsuit. In their affidavit, appellees recited the execution of the initial warrants, described the contraband that was discovered, and stated that the office was used by the entire Flex Squad, including Officers Smith and Mengel. They expressed the belief that probable cause existed that the narcotics laws of the State "have been violated by *each* of the above named officers, and that it is reasonable that additional contraband may be concealed within their individual lockers." (Emphasis added). The affiants noted that, "[a]s of now," only the lockers belonging to Officers Hatley, Jones, Nagovich, and Ali "have been identified." They added, however, that "[a]ffiant Danielczyk

---

**4.** That officer, who is not involved in this case, was charged criminally but, we are advised, was acquitted.

also has prior knowledge that Officers Jones and Mengel have been implicated in the theft of cellular phones belonging to arrestees" and that "allegations against Officers Jones and Mengel have been made as to the planting of controlled dangerous substances on citizens in an effort to knowingly make false arrests." The affidavit gives no details with respect to the allegations regarding the theft of cell phones or the planting of CDS on citizens, or as to the basis of Danielczyk's "prior knowledge."

Upon those allegations, appellees stated that there was probable cause to believe that all seven officers, including Smith and Mengel, were violating the controlled dangerous substance laws and were using the Southwest District Flex Office and the lockers of Officers Hatley, Jones, Nagovick, and Ali "to facilitate their illegal activity." Curiously, although the affidavit clearly alleged, and, indeed, was largely based on, information discovered as a result of the search conducted earlier that afternoon, on December 29, 2005, the judge to whom it was presented stated that it was "[s]worn to before me and subscribed *in my presence* this 27th day of *September,* 2005." (Emphasis added). There is no explanation in this record of why the affidavit is dated more than two months before most of the information on which it is based was received.

Appellees attached as an exhibit to their motion to dismiss an unsigned, undated, unwitnessed, unattested Return, indicating that a warrant was issued and was executed at or about 5:00 p.m. on December 29, 2005, and listing the items allegedly seized from "the office described in the warrant." Among those items were ziploc bags containing pills, white powder, and green leafy substance, cellular phones, electric scales, counterfeit CDs and DVDs, and pornographic magazines. The purported return does not indicate whether any of that material was discovered in the desk, locker, or other property of Smith or Mengel.

In their complaint, appellants alleged, in relevant part, that:

(1) prior to December 29, 2005, they had not observed any member of the Flex Squad unlawfully possessing or distributing any controlled dangerous substances and were no t, themselves, involved in such activity,

(2) appellees "acted in reckless disregard of the truth and falsely accused the Plaintiffs of committing crimes while employed as Baltimore City Police Officers,"

(3) appellees falsely stated, on the "scant evidence set forth in the affidavit," that they believed there was sufficient probable cause to believe that Smith was violating the CDS laws and was using the Flex Office to facilitate illegal activity,

(4) they falsely stated that Mengel had been implicated in the theft of cell phones and had planted CDS on citizens in order to knowingly make false arrests,

(5) they knew or should have known that Smith and Mengel were providing loyal service to the Department and were not engaged in any illegal activity,

(6) the false statements, including the false statement that appellees honestly believed that Smith and Mengel were involved in drug crimes, were "set forth for the malicious purpose of embarrassing [Smith and Mengel] and causing them to be subject to public ridicule, scorn, dishonor, and embarrassment and to ruin their careers as Baltimore City Police Officers,"

(7) the false statements "were leaked by the Defendants to members of the media for the express purpose of causing publication of the false statements," and

(8) as a direct result of appellees' "malicious defamation" Smith's police powers were suspended on January 13, 2006, and they both have suffered great emotional trauma and other damage, including the "ruination" of their police careers.[5]

---

5. Although we are unable to find in the complaint an allegation by Mengel that her police powers were suspended, there is an unrebutted statement in appellants' joint response to the motion to dismiss, not excluded by the court, that they "admit that *their* police powers were suspended." (Emphasis added). In appellants' brief in this Court,

Appellees moved to dismiss the complaint on the grounds that appellants had failed to comply with the mandatory notice provisions of the Local Government Tort Claims Act (LGTCA), that "as writers of a criminal warrant," they were immune from a defamation suit by absolute and qualified privilege, and that the complaint failed to allege a *prima facie* case of defamation upon which relief could be granted. Those defenses were explicated in some greater detail in an accompanying memorandum. As to the notice requirement, appellees pointed out that Maryland Code, § 5–304(b) of the Cts. & Jud. Proc. Article (CJP), which is part of the LGTCA, prohibits an action for unliquidated damages against a local government or its employees unless notice of the claim is given within 180 days after the injury. The notice, they added, must be in writing and state the time, place, and cause of the injury.

The defense of absolute immunity was based on a line of Maryland cases holding that persons participating in the judicial process enjoy an absolute immunity from liability for making defamatory statements in the course of judicial proceedings. The judicial system, they contended, could not function without absolute immunity to protect officers from civil liability for statements made in applications for search warrants. In addition to this absolute immunity, appellees asserted a qualified immunity for discretionary acts committed by police officers without actual malice, *i.e.*, "an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff." The complaint, they urged, was "bereft of any facts that support a claim of evil or rancorous motive."

Finally, urging that appellants were public figures or public officials, appellees contended that, under *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and its progeny, appellants were required to show that appellees also acted with what may be called "Constitutional malice," that is, that they had actual knowledge that their statements

---

Mengel states that, at some point, she retired from the police department because of injuries sustained in the line of duty.

were false or acted in reckless disregard of whether the statements were true or false, and that appellants had not done so. Appellees contended, as well, that, under common law principles, appellants had not pled that there had been a "publication" for purposes of a defamation suit—that the issuance of a search warrant does not constitute publication, that they had not shown that the statements complained of were false, and that they had failed to allege actual damages.

It does not appear that any of the parties requested a hearing on the motion. On August 3, 2006, the court granted the motion, without a hearing, without any explanation or assignment of reasons, but with prejudice, and this appeal ensued. Appellants obviously believe that the court dismissed their complaint on the ground of absolute immunity, for that is the only issue raised or addressed in their initial brief in the Court of Special Appeals. We granted *certiorari* on our own initiative, prior to proceedings in the Court of Special Appeals, to consider whether police officers do, indeed, possess absolute immunity for defamatory statements made in an application for a search warrant. It is evident, now that we have the record and the appellees' responsive brief, that other issues may also be in the case, although we may quickly dispose of them.

## DISCUSSION

### Statutory Notice

■ As we have observed, CJP § 5–304(b) provides that an action for unliquidated damages may not be brought against a local government or its employees unless "notice of the claim required by this section is given within 180 days after the injury." The notice must be in writing and must state the time, place, and cause of the injury, and, in Baltimore City, it must be given to the City Solicitor.[6] *See* § 5–304(c). Section

---

6. Although the Baltimore City Police Department is a State, not a City, agency (*see Clea v. Mayor & City Council of Baltimore,* 312 Md. 662, 541 A.2d 1303 (1988)), it is defined as a "local government" for

5–304(d) provides, however, that, "unless the defendant can affirmatively show that its defense has been prejudiced by lack of required notice, upon motion and for good cause shown the court may entertain the suit even though the required notice was not given."

Although appellees claimed in their motion to dismiss and accompanying memorandum that appellants had failed to comply with that requirement, they offered no facts in support of that argument. It was, indeed, a bald, unsupported allegation. In response, appellants pointed out that they had filed suit against appellees within six months of the tortious act, that the City Solicitor had accepted service of the complaint, and that, in any event, they sent notice to the City on June 23, 2006, which, they claimed, was also within six months. They did not attach a copy of the notice to their response.

A fair reading of the complaint indicates that two acts of defamation were alleged—the making of false statements in the application for the search warrant and the voluntary disclosure of those statements by appellees to the news media. Notwithstanding the obviously incorrect date given by the judge on the affidavit, it is evident that the first of those events occurred on December 29, 2005, when all parties agree the application was, in fact, made. The second, at least inferentially, occurred some time later, although when is not alleged. The complaint was filed May 5, 2006. When appellees complained that *the City,* which was *not* sued, had not received a separate notice of the claim, such a notice was sent to the City on June 23, 2006. Apart from the information supplied in the complaint, which set forth everything that would be required in a separate notice, the separate notice itself was given within 180 days after December 29, 2005, and would therefore be timely.

---

purposes of LGTCA. *See* CJP § 5–301(d)(21). Thus, employees of the Department are regarded as local government employees. *See* CJP § 5–301(c). City police officers therefore have the protection and immunity provided by LGTCA. Because this action was against city police officers, the City was entitled to the notice required by § 5–304.

Appellees' argument, as set forth in their brief, is that the giving of timely notice is a condition precedent to filing suit, that compliance with that condition must be alleged in the complaint, and, as the notice was not given prior to the filing of suit and the complaint therefore did not and could not alleged compliance, the complaint must be dismissed. For that proposition, appellees cite *Neuenschwander v. Washington Suburban Sanitary Commission*, 187 Md. 67, 48 A.2d 593 (1946) and *Rios v. Montgomery County*, 386 Md. 104, 872 A.2d 1 (2005).

■ Those cases, and others, do, indeed, regard the notice requirement as a condition precedent to the ability to maintain an action against a local government or, under the LGTCA, against its employees, and we do not depart from that precept here. In those cases, however, and in the others in which we have similarly enforced the notice requirement, timely and sufficient notice was not given at all and the lawsuit was filed after the period for giving the notice had expired. That is not the case here. Not only was a separate notice given within the time allowed, prior to the dismissal of the complaint, but the complaint, itself, was filed within the 180–day period allowed and provided all of the information required to be contained in the notice.

■ As we have long made clear, the purpose of the notice requirement is to apprise local governments of possible liability at a time when they can conduct their own investigation into the relevant facts, while evidence and the recollection of witnesses are still fresh. *See Faulk v. Ewing*, 371 Md. 284, 298–99, 808 A.2d 1262, 1272 (2002); *Rios v. Montgomery County, supra*, 386 Md. at 126–27, 872 A.2d at 14. That purpose has clearly been served here, so the fact that the complaint was filed prior to the sending of the notice does not constitute a ground for dismissing the complaint. Even if, in a purely technical sense, the notice should precede the complaint, appellees have failed to allege, much less affirmatively

show, that they were prejudiced. If the Circuit Court dismissed the complaint on this ground, it erred.[7]

### Sufficiency of Allegations

The gravamen of the complaint consisted of the statements by appellees that appellants were violating the controlled dangerous substance laws of the State, that they were using the police office and lockers to facilitate their illegal activity, and that Mengel had been implicated in the theft of cellular phones and had planted controlled dangerous substances on citizens in an effort to knowingly make false arrests. Those statements are obviously accusations of criminal activity on the part of appellants.

The complaint alleges that those statements were false and that appellees "knew or should have known" that they were false. It alleges that, in making those statements, appellees "acted in reckless disregard of the truth" and that they were made "for the malicious purpose of embarrassing [appellants] and causing them to be subject to public ridicule, scorn, dishonor, and embarrassment and to ruin their careers as Baltimore City Police Officers." The false statements, the complaint adds, were leaked by appellees to members of the news media "for the express purpose of causing publication of the false statements." As a "direct result" of the "malicious defamation," Smith's police powers were suspended on January 13, 2006, and both plaintiffs "have suffered great emotion-

---

7. There is another sub-issue that, in light of our conclusion that there was at least substantial, if not full, compliance with CJP § 5-304, we need not resolve. In response to appellees' motion to dismiss, appellants pointed out that they had not sued Baltimore City and, for that reason, were not required to give the statutory notice to the City. In *Ennis v. Crenca,* 322 Md. 285, 587 A.2d 485 (1991), we held that, where a local official is sued for his or her own conduct that is not in furtherance of the local government's business and no action is brought against the local government itself, notice under § 5-304 need not be given to the local government. In that case, we held that the official, sued for making defamatory statements to the news media, was acting in her own personal and political interest and not that of the county. It is not necessary for us to determine whether the principles enunciated in *Ennis* would apply here.

al trauma and other damage, including the ruination of their police careers."

Appellees raise three objections with respect to those allegations. First, they contend that, as police officers, appellants are public officials subject to the more rigorous standards of *New York Times v. Sullivan,* and that they may not recover for defamation unless they plead and show that appellees had actual knowledge that their statements were false or acted with reckless disregard of whether those statements were true or false. The allegations of the complaint, they aver, fail to satisfy that exacting standard. They regard the allegations that they acted with malice and reckless disregard of truth as mere "buzz words."

Although this Court does not seem to have ruled directly on the matter, it appears to be well-settled, in part from opinions of the U.S. District Court for Maryland, that police officers, from patrol officers to chiefs, are regarded for *New York Times* purposes as public officials.[8] To recover, therefore, appellants will have to prove, by clear and convincing evidence, that appellees acted with what has been termed "Constitutional malice," *i.e.,* that they either knew their state-

---

8. *See Seymour v. A.S. Abell Co.,* 557 F.Supp. 951 (D.Md.1983); *Carroll v. City of Westminster,* 52 F.Supp.2d 546 (D.Md.1999); *Thuma v. Hearst Corp.,* 340 F.Supp. 867 (D.Md.1972); *Fearnow v. Chesapeake & Potomac Telephone Co. of Maryland,* 104 Md.App. 1, 68, 655 A.2d 1, (1995), *rev'd on other grounds,* 342 Md. 363, 676 A.2d 65 (1996). *See also Gray v. Udevitz,* 656 F.2d 588 (10th Cir.1981); *Coughlin v. Westinghouse Broadcasting and Cable, Inc.,* 780 F.2d 340 (3rd Cir.1985); *McKinley v. Baden,* 777 F.2d 1017 (5th Cir.1985); *Meiners v. Moriarity,* 563 F.2d 343 (7th Cir.1977); *Mercer v. City of Cedar Rapids,* 308 F.3d 840 (8th Cir.2002); *Smith v. Russell,* 456 So.2d 462 (Fla.1984); *Reed v. Northwestern Pub. Co.,* 124 Ill.2d 495, 125 Ill.Dec. 316, 530 N.E.2d 474 (1988); *Roche v. Egan,* 433 A.2d 757 (Me.1981); *NAACP v. Moody,* 350 So.2d 1365 (Miss.1977); *Malerba v. Newsday,* 64 A.D.2d 623, 406 N.Y.S.2d 552 (N.Y.A.D.1978); *Dellinger v. Belk,* 34 N.C.App. 488, 238 S.E.2d 788 (1977); *McClain v. Arnold,* 275 S.C. 282, 270 S.E.2d 124 (1980); *Starr v. Beckley Newspapers Corp.,* 157 W.Va. 447, 201 S.E.2d 911 (1974). We have held law enforcement officers to be public officials for purposes of the common law public official immunity from tort liability for negligent conduct. *Williams v. Mayor & City Council of Baltimore,* 359 Md. 101, 138, 753 A.2d 41, 61 (2000).

ments were false or acted with reckless disregard of whether they were true or false.

■ The complaint alleges that the statements charging criminal behavior on the part of appellants were false and were made with reckless disregard of truth or falsity. The complaint is very thin with respect to facts supporting the averment of reckless disregard, and it may well be that appellees have a right to further detail. There is enough there, however, to preclude, on a first motion to dismiss, a dismissal *with prejudice*. If the court regarded the allegations as merely conclusory and insufficient, it should have permitted appellants to amend their complaint, if they properly can, to provide a greater factual basis. Thus, if the court's dismissal with prejudice was based on the insufficiency of the allegations to withstand a *New York Times* defense, it abused its discretion.

■ That is true as well with respect to appellees' argument that the complaint failed to allege the elements of the common law tort of defamation. To present a *prima facie* common law case for defamation, a plaintiff must plead and prove four things: "that the defendant made a defamatory statement to a third person; that the statement was false; that the defendant was legally at fault in making the statement; and that the plaintiff thereby suffered harm." *Gohari v. Darvish*, 363 Md. 42, 54, 767 A.2d 321, 327 (2001), quoting from *Rosenberg v. Helinski*, 328 Md. 664, 675, 616 A.2d 866, 871 (1992).

■ Words that falsely impute criminal conduct to a plaintiff are defamatory. *A.S. Abell Co. v. Barnes*, 258 Md. 56, 265 A.2d 207 (1970), *cert. denied*, 403 U.S. 921, 91 S.Ct. 2224, 29 L.Ed.2d 700 (1971). That the complaint was sufficient to allege the false imputation of criminal conduct to appellants does not seem to be contested by appellees and, in any event, is clear. Appellees make the curious argument that the complaint does not allege that the false statements were ever published or communicated to a third party. In making that argument, they ignore entirely the allegation that the state-

ments were leaked to the news media and, instead, rely on *Picone v. Talbott,* 29 Md.App. 536, 546, 349 A.2d 615, 620–21 (1975) and *Bartlett v. Christhilf,* 69 Md. 219, 224, 14 A. 518, 519–20 (1888) for the proposition that statements made in an application for a warrant are not published. Those cases do not, in any way, support that proposition. *Bartlett,* as we shall see, did not involve and had nothing to do with a warrant. *Picone,* misconstruing some language in *Bartlett,* did hold that statements made in an application for arrest warrant were privileged, but it did not hold that such statements are not published. Whether a person has a privilege to make defamatory statements in a warrant application has nothing to do with whether the statements are published.

█ Appellees' argument regarding falsity is even more peculiar. They claim that "[n]o where in the complaint do Appellants allege that these statements *have been proved false,* and therefore, they utterly fail to satisfy an element of the tort of defamation." (Emphasis added). A plaintiff does not have to allege that defamatory statements have already, previously been proved false, but only that they *are* so. Falsity will have to be proved at trial. We have already addressed appellees' contention that the complaint fails to sufficiently allege reckless disregard of truth and need not repeat that discussion.

█ Finally, appellees argue that the complaint fails to allege actual damages. That argument seems to be based on the fact that the plaintiffs "neither lost their jobs nor were charged with a crime in relation to the execution of the search warrant." Appellees overlook the allegation that appellees' conduct caused appellants to have their police powers suspended, which would seem, by fair inference, to have precluded them from fulfilling the duties of a police officer and thus adversely affect their employment.

### *Privilege/Immunity*

The crux of this case is whether appellees enjoyed either an absolute or qualified privilege to make the statements they

made in their application for the search warrant and then voluntarily to share those statements with the news media. Although we have done this before, it would be helpful at the outset to define and distinguish these two kinds of privileges, or immunities. In *Di Blasio v. Kolodner*, 233 Md. 512, 522, 197 A.2d 245, (1964), we explained:

"An absolute privilege is distinguished from a qualified privilege in that the former provides immunity regardless of the purpose or motive of the defendant, or the reasonableness of his conduct, while the latter is conditioned upon the absence of malice and is forfeited if it is abused."

*See also Miner v. Novotny*, 304 Md. 164, 167, 498 A.2d 269, 270 (1985).

Appellees maintain that they have an absolute privilege with respect to statements made in an application for search warrant because such an application is part of the judicial process and this Court has long recognized that statements made in the course of the judicial process are protected by an absolute privilege that is not defeated even if the statements are made maliciously. Appellants contend that an application for a search warrant is *not* part of the judicial process and therefore defamatory statements in such an application are not absolutely privileged.

The starting point for our analysis is a trilogy of cases decided on the same day in June, 1888. The first of those cases, *Maulsby v. Reifsnider*, 69 Md. 143, 14 A. 505 (1888) involved whether statements made by an *attorney* in the course of a judicial proceeding were subject to an absolute or qualified privilege. The court defined the practical difference in terms of whether the statements were relevant to the proceeding. If the privilege is absolute, relevance or irrelevance is immaterial; the only issue is whether they were made in the course of a judicial proceeding. If the privilege is qualified, the statements would not be protected unless they were relevant. Rejecting English precedent, which afforded an absolute privilege to attorneys' statements, the Court opted for the qualified privilege, holding that "if counsel in the trial

of a cause maliciously slanders a party, or witness or any other person in regard to a matter that has no *reference* or *relation* to, or connection with, the case before the Court, he is and ought to be answerable in an action by the party injured." *Id.* at 162, 14 A. at 510. (Emphasis in original). As we shall explain, the Court later modified that view somewhat.

The second case, *Hunckel v. Voneiff,* 69 Md. 179, 14 A. 500 (1888) concerned the nature of the privilege possessed by a *witness,* and in contrast to the position taken in *Maulsby* with respect to an attorney, the Court concluded that a witness had an absolute privilege, explaining:

"The case now before us is not that of an *advocate* but of a *witness,* and in our opinion it is of the greatest importance to the administration of justice that witnesses should go upon the stand with their minds absolutely free from apprehension that they may subject themselves to an action of slander for what they may say while giving their testimony."

*Id.* at 187, 14 A. at 501. (Emphasis in original).

In reaching that conclusion, and in contrast to what it had done in *Maulsby,* the Court decided to follow the English approach, which provided an absolute privilege for witnesses, notwithstanding that the weight of then-existing American cases was in favor of a more limited privilege. The Court adopted not just the English decisions, but "the law on this subject as they have laid it down," *Id.* at 193, 14 A. at 504, including the rationale for those decisions. For that, the Court turned in particular to two cases—the judges' response to the House of Lords in *Dawkins v. Rokeby, Law Rep.* 7 *H.L.,* 744, and Chief Judge Cockburn's opinion in *Seaman v. Netherclift, Law Rep.,* 2 *C.P. Div.,* 53.

It is clear from both of those cases that the absolute privilege afforded to witnesses under English law was limited to "what he says or writes in giving evidence before a Court of justice," *Hunckel,* at 189, 14 A. at 502, quoting from *Dawkins,* "to the extent of what he says *in course of his examination,"* *Hunckel,* at 189, 14 A. at 502, quoting from *Seaman.* The Court noted Chief Judge Cockburn's caveat that "what he

says before he enters or after he has left the witness-box is not privileged." *Hunckel,* 69 Md. at 190, 14 A. at 502. The rationale for the rule, as articulated in *Dawkins,* was that "public policy requires that witnesses should give their testimony free from any fear of being harassed by an action on an allegation, whether true or false, that they acted from malice." *Hunckel,* at 189, 14 A. at 502, quoting from *Dawkins.*

The third case, *Bartlett v. Christhilf,* 69 Md. 219, 14 A. 518 (1888) concerned the privilege to be accorded statements made by *parties* to a lawsuit in their pleadings and motions. In a way, it is the most relevant of the three cases because it was subsequently misconstrued by the Court of Special Appeals in *Picone v. Talbott,* 29 Md.App. 536, 349 A.2d 615 (1975) and has been misconstrued by appellees.

In the course of a lawsuit brought by Muir against Whiting and Bartlett in the equity court in Baltimore, Bartlett and Christhilf were appointed by the court as co-receivers of the firm that apparently was the subject of that litigation. Several weeks later, Christhilf filed a petition in the underlying case alleging that Bartlett was unlawfully withholding assets from the receivership, obstructing collection of the firm's assets, and acting in contempt of the court's authority, and that he had embezzled money belonging to the firm. Bartlett answered the petition, but before any hearing could be held, the litigation that had produced the receivership was settled and dismissed. Bartlett then sued Christhilf for libel and malicious abuse of process. The issue presented, with respect to the libel count, was whether the statements in Christhilf's petition, filed in the equity case, were absolutely privileged.

Adopting the approach taken in *Hunckel,* the Court held that those statements were protected by an absolute privilege. In that regard, the Court stated:

> "It is stated in a work of high authority that an action for defamation will not lie for anything sworn or stated in the course of a judicial proceeding before a Court of competent jurisdiction, such as defamatory bills or proceedings filed in chancery, or in the ecclesiastical Courts, or in affidavits con-

taining false and scandalous assertions against others. *Therefore, if a man goes before a justice of the peace and exhibits articles against the plaintiff containing divers false and scandalous charges concerning him, the plaintiff cannot have an action for a libel in respect of any matter contained in such articles, for the party preferring them has pursued the ordinary course of justice in such a case; and if actions should be permitted in such cases, those who have just cause for complaint would not dare to complain, for fear of infinite vexation.*"

*Id.* at 223–24, 14 A. at 518, quoting in part from 2 *Addison on Torts,* § 1092 (*Wood's Ed.*) (Emphasis added).

The Court observed that there was "a large collection of cases where parties have from time to time attempted to get damages for slanderous and malicious charges contained in affidavits *made in the course of a judicial proceeding* " but that "in no one instance has the action been held to be maintainable." *Bartlett,* at 224, 14 A. at 519 (Emphasis added).

More recently, the Court has revised some of the semantic distinctions, come to view the privilege possessed by counsel, witnesses, and parties as essentially the same and therefore as applying to both evidentiary and non-evidentiary statements, and to extend the absolute privilege to documents and reports prepared for use in judicial proceedings, even if not actually filed in the proceeding.

Some of those revisions were announced in *Kennedy v. Cannon,* 229 Md. 92, 96–97, 182 A.2d 54, 57 (1962) where, after quoting at length from *Maulsby* (dealing with the privilege enjoyed by attorneys), the Court explained that "[w]hat was characterized in that case as a qualified privilege for communications, conditioned on their being pertinent or relevant to a judicial proceeding, without regard to the motive of the speaker, is referred to by modern text writers and in case law as an absolute privilege." The Court continued:

"This absolute immunity extends to the judge as well as witnesses and parties to the litigation, for defamatory state-

ments uttered in the course of a trial or contained in pleadings, affidavits, depositions, and other documents directly related to the case. (citation omitted). An absolute privilege is distinguished from a qualified privilege in that the former provides immunity regardless of the purpose or motive of the defendant, or the reasonableness of his conduct, while the latter is conditioned upon the absence of malice and is forfeited if it is abused."

*Kennedy,* 229 Md. at 97, 182 A.2d at 57. The extension of the privilege to reports prepared for use in judicial proceedings was announced in *Adams v. Peck,* 288 Md. 1, 415 A.2d 292 (1980).

Those cases involved actual judicial proceedings—testimony, argument of counsel, and pleadings and documents prepared for, filed, or presented in court. In several cases—*Gersh v. Ambrose,* 291 Md. 188, 434 A.2d 547 (1981), *Odyniec v. Schneider,* 322 Md. 520, 526–28, 588 A.2d 786, 788–90 (1991), and *Reichardt v. Flynn,* 374 Md. 361, 823 A.2d 566 (2003)—we recognized that the absolute privilege for judicial proceedings could apply in certain administrative proceedings as well, depending on "(1) the nature of the public function of the proceeding, and (2) the adequacy of procedural safeguards which will minimize the occurrence of defamatory statements." *Gersh v. Ambrose, supra,* 291 Md. at 197, 434 A.2d at 551–52. None of those cases, however involved statements made in an application for an arrest or search warrant.

■■■ The issue of whether statements made in a warrant application enjoy an absolute privilege, on the theory that an application presented to a judge is in the nature of a judicial proceeding, has never been decided by this Court, although the emphasized language quoted above from *Bartlett v. Christhilf* did lead the Court of Special Appeals, in *Picone v. Talbott, supra,* 29 Md.App. 536, 546, 349 A.2d 615, 620–21, to hold that statements made in an application for an arrest warrant were absolutely privileged. Appellees also rely on that language and on *Picone.* Some explanation is in order.

As we observed, *Bartlett v. Christhilf* did not involve an application for a warrant, but rather a petition filed in court in an on-going lawsuit, which the Court held was protected by an absolute privilege. Consistent with its holding in the two other cases decided contemporaneously, the Court iterated the general rule that an action for defamation will not lie "for anything sworn or stated in the course òf a judicial proceeding before a Court of competent jurisdiction, such as defamatory bills or proceedings filed in chancery, or in the ecclesiastical Courts, or affidavits containing false and scandalous assertions against others." *Bartlett,* 69 Md. at 223–24, 14 A. at 518–19. Then follows, immediately, the language in question, that we italicized, regarding proceedings before a justice of the peace.

Without any analysis, the Court of Special Appeals in *Picone* assumed that the example given of a man who "goes before a justice of the peace and exhibits articles against the plaintiff containing divers false and scandalous charges concerning him" must have referred to an application for an arrest warrant, for it relied on that language as direct precedent in holding that statements in such an application were absolutely privileged. A careful examination of the role and jurisdiction of justices of the peace in 1888 casts serious doubt on the validity of that assumption.

As noted in *Yantz v. Warden,* 210 Md. 343, 347, 123 A.2d 601, 603 (1956), *cert. denied,* 352 U.S. 932, 77 S.Ct. 236, 1 L.Ed.2d 167, the office of justice of the peace dates back to colonial times. Justices of the peace served as conservators of the peace in their respective counties and had the jurisdiction conferred by law, which changed over time. They had power to issue both arrest and search warrants, but they also had trial jurisdiction in civil cases involving $100 or less and in misdemeanor criminal cases, and that appeared to be their principal function *See* Maryland Code (1888), Art. 52, dealing almost exclusively with the civil trial jurisdiction of the justices of the peace; also Armstrong Thomas, PROCEDURE IN JUSTICE CASES (1906); John H.B. Latrobe, THE JUSTICES' PRACTICE UNDER THE LAWS OF MARYLAND, (7th ed. 1880). *See also State v. Ward,* 95 Md. 118, 121, 51 A. 848, 849 (1902) and *Hall v.*

*State,* 5 Md.App. 394, 396, 247 A.2d 548, 549 (1968). It was thus possible for a person to "[go] before a justice of the peace and exhibit[ ] articles against the plaintiff containing divers false and scandalous charges concerning him" in a wide variety of contexts.

That statement in *Bartlett,* seized upon in *Picone,* has no special reference to applications for arrest or search warrants. It follows the general statement that an action for defamation will not lie "for anything sworn or stated *in the course of a judicial proceeding* before a Court of competent jurisdiction" (emphasis added) and, more likely than not, had reference to what was, in fact, before the Court in *Bartlett*—a pleading or other document filed by a party in a pending judicial proceeding or one that inaugurated such a proceeding. We can think of no reason for the Court to go off on a tangent and express an opinion regarding a matter that was not then before it and that had no connection with the matter that *was* before it. At best, it would apply to a warrant application only if the presentation of such an application constitutes or is in the nature of a judicial proceeding for purposes of determining a privilege or immunity.

In that regard, we note that, in *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), the Supreme Court, in an action under 42 U.S.C. § 1983, denied an absolute privilege for the procuring of an arrest warrant based on an affidavit that failed to establish probable cause. Rejecting the officer's attempt to analogize his application for an arrest warrant to the seeking of an indictment by a prosecutor, which, in *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), the Court had held to be absolutely privileged, the *Malley* Court observed that, although a vital part of the administration of criminal justice, the act of applying for a warrant "is further removed from the judicial phase of criminal proceedings than the act of a prosecutor in seeking an indictment" and that "the judicial process will on the whole benefit from a rule of qualified rather than absolute immunity." *Malley,* 475 U.S. at 342–43, 106 S.Ct. at 1097, 89 L.Ed.2d at 279–80. Perhaps more to the point, the Court

observed that "the distinction between a search warrant and an arrest warrant would not make a difference in the degree of immunity accorded the officer who applied for the warrant." *Id.* at 344 n. 6, 106 S.Ct. at 1098 n. 6, 89 L.Ed.2d at 280 n. 6. *See also Kalina v. Fletcher,* 522 U.S. 118, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997) (denying absolute immunity to a prosecutor for making false statements in an application for arrest warrant).[9]

■■■ *Malley* is both instructive and persuasive, as, notwithstanding that it was a § 1983 action and not one for defamation, it rests on a solid common law foundation. As we did in *Gill v. Ripley,* 352 Md. 754, 768, 724 A.2d 88, 95 (1999), we acknowledge and adopt the precept confirmed in *Burns v. Reed,* 500 U.S. 478, 486, 111 S.Ct. 1934, 1939, 114 L.Ed.2d 547, 558 (1991) that "the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question," because "[t]he presumption is that quali-

---

9. *Compare Burns v. Reed,* 500 U.S. 478, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991), where the Court held that a *prosecutor* was entitled to absolute immunity in connection with his appearance at a probable cause hearing. The defendant had already been arrested and charged with shooting her two children. The probable cause hearing, at which the prosecutor examined police witnesses, was for the purpose of obtaining a warrant to search the defendant's home. The evidence indicated that there were two kinds of procedures used in the Indiana court with respect to warrants. The "general" procedure was simply to present an affidavit of probable cause; the other, used in *Burns,* was a closed-door evidentiary hearing at which the prosecutor called witnesses and presented evidence. The Supreme Court viewed the prosecutor's role in that second kind of proceeding—appearing before a judge and presenting evidence in support of a motion for a search warrant—as involving his role as "advocate for the State" rather than as an "investigating officer." *Id.* at 491, 111 S.Ct. at 1942, 114 L.Ed.2d at 561. The Court also considered such a proceeding as "connected with the initiation and conduct of a prosecution, particularly where the hearing occurs after arrest, as was the case here." *Id.* at 492, 111 S.Ct. at 1942, 114 L.Ed.2d at 562. Several times in the Opinion, the Court cited *Malley,* with apparent approval. We do not read *Burns,* which involved a *prosecutor* who traditionally enjoys absolute immunity for prosecutorial functions, as circumscribing *Malley,* which involved a *police officer,* who does not traditionally enjoy absolute immunity, but only qualified public official immunity.

fied rather than absolute immunity is sufficient to protect government officials in the exercise of their duties."

An application for a search warrant may be said to be in the nature of a judicial proceeding because the application must be made to a judge and because the issuance of a warrant is a judicial act. On the other hand, unlike the kinds of statements to which we have accorded an absolute privilege, an application for search warrant, at least in the ordinary case, is not made in the course of an existing judicial proceeding and does not inaugurate or necessarily lead to one. It is, as the *Malley* Court concluded, several steps removed from a judicial proceeding. Moreover, the presentation of a search warrant application is almost always *ex parte,* often occurring at the judge's home during the evening hours, with little or no ability to test the accuracy of the affiant's averments. Absent some knowledge to the contrary, the judge necessarily assumes good faith and truthfulness on the part of the affiant and looks to see only whether those averments, *assuming them to be true,* suffice to establish probable cause to believe that incriminating evidence will b e found at the place or on the person to b e searched. *See Volodarsky v. Tarachanskaya,* 397 Md. 291, 306–07, 916 A.2d 991, 1000 (2007); also *Franks v. Delaware,* 438 U.S. 154, 169, 98 S.Ct. 2674, 2683, 57 L.Ed.2d 667, 680 (1978):

> "The usual reliance of our legal system on adversary proceedings itself should be an indication that an *ex parte* inquiry is likely to be less vigorous. The magistrate has no acquaintance with the information that may contradict the good faith and reasonable basis of the affiant's allegations. The pre-search proceeding will frequently be marked by haste because of the understandable desire to act before the evidence disappears; this urgency will not always permit the magistrate to make an extended independent examination of the affiant or other witnesses."

The normal trappings of a judicial proceeding are thus lacking. In that regard, the presentation of an application for search warrant may be more akin to an investigatory proceeding rather than a judicial one.

Although a warrant application is not in the nature of an administrative proceeding, as in *Gersh* and *Reichardt,* it is, we think, sufficiently removed from the normal judicial proceeding to invoke the caveats noted in those cases; *i.e.,* in determining whether an absolute privilege should apply to defamatory statements made in a search warrant application, we should look to the nature of the public function of the proceeding and the adequacy of procedural safeguards that will minimize the occurrence of defamatory statements. In doing so, we are convinced, as was the *Malley* Court, that defamatory statements made i n an application for search warrant should be protected by a qualified, not an absolute, privilege.

A critical underpinning to allowing an absolute privilege for statements made in the course of a judicial proceeding is that, because such a proceeding is normally adversarial in nature, there is usually the ability to test the veracity of those statements and to publicly rebut them. Witnesses can be cross-examined; contradictory evidence can be presented. A neutral fact-finder, after examining *all* of the evidence presented, can decide what is believable and what is not. Through that process, false statements can be exposed for what they are. Even in sub-proceedings that may themselves be *ex parte* in nature, such as requests for temporary restraining orders, the opportunity exists later in the case to expose and sanction false statements. That is the counterweight to allowing parties, witnesses, and attorneys to speak freely in the course of judicial proceedings, unhampered by the fear of being sued for what they say.

That counterweight simply does not exist with respect to search warrant applications, and that affects both the public nature of the proceeding and the search for procedural safeguards to minimize defamatory statements. Although the application must be supported by an affidavit under oath or affirmation, the process is not adversarial; nor is it an engine for the discovery of truth. The judge hears only one side of the story told by the police, who are seeking a necessary permission to invade a Constitutionally-protected zone of pri-

vacy, and, as noted, the judge often has no practical ability to determine the veracity of the affiant's allegations.

We denied an absolute privilege in a somewhat analogous situation in *McDermott v. Hughley*, 317 Md. 12, 561 A.2d 1038 (1989), where, following a meeting between a police employee and his supervisor, called to discuss the employee's mental status, a psychologist who was present at the meeting sent a report to the employer containing defamatory statements. In a subsequent defamation action, the psychologist argued that the situation was akin to an administrative proceeding and that he had an absolute privilege. We rejected that argument, pointing out that, unlike a judicial or administrative proceeding, "there was no public hearing adversary in nature; no compellable witnesses were sworn or cross-examined; no reviewable opinion or analysis was generated; and, most significantly, [the plaintiff] did not have the opportunity to present his side of the story." *Id.* at 26, 561 A.2d at 1045. In *Gersh v. Ambrose, supra,* 291 Md. 188, 434 A.2d 547, we denied absolute immunity for defamatory statements made at a public hearing. *Compare Miner v. Novotny, supra,* 304 Md. 164, 498 A.2d 269 (absolute privilege allowed for brutality complaint made against deputy sheriff that was subject to testing in administrative hearing under Law Enforcement Officers Bill of Rights law); *Odyniec v. Schneider, supra,* 322 Md. 520, 588 A.2d 786 (absolute privilege for statements made in connection with statutory health claims arbitration proceeding); *Reichardt v. Flynn, supra,* 374 Md. 361, 823 A.2d 566 (absolute privilege for complaint made against teacher that was subject to testing in administrative hearings before county and State school boards).

The rationale for being cautious about extending an absolute privilege to an *ex parte* search warrant proceeding was well-stated in *Franks v. Delaware, supra,* 438 U.S. at 168, 98 S.Ct. at 2682, 57 L.Ed.2d at 680: "[t]he requirement that a warrant not issue 'but upon probable cause, supported by Oath or affirmation,' would be reduced to a nullity if a police officer was able to use deliberately falsified allegations to demon-

strate probable cause, and, having misled the magistrate, then was able to remain confident that the ploy was worthwhile."

Unlike statements made in the course of judicial proceedings, or even administrative contested case proceedings subject to the protections of an Administrative Procedure Act, statements made in a search warrant application may never be subject to testing, notwithstanding the prospect of a *Franks* hearing. Indeed, their veracity is not likely ever to be tested in a criminal proceeding unless (1) they concern a person who is subsequently arrested and charged, (2) evidence seized in the search is offered into evidence against the person, and (3) the defendant can show, through evidence, that the statements were not just false but were deliberate misstatements or were made with reckless disregard of truth or falsity. This case is a good example: the warrant application was made on December 29, 2005, and eighteen months later, there has yet to be any criminal proceeding instituted against appellees, and, so far as this record reveals, there appears to be no continuing investigation into their conduct. The allegedly false statements made to the judge and leaked to the press remain out there, with no ability on the part of appellants, outside a defamation action, to prove that they were false and maliciously made.

For these reasons, we hold that statements made in an application for search warrant are not protected by an absolute privilege.[10] As noted, police officers are public officials and therefore enjoy the common law immunity possessed

---

10. As part of their argument that statements made in a warrant application are subject to an absolute privilege, appellees cite *Di Blasio v. Kolodner*, 233 Md. 512, 519–23, 197 A.2d 245, 249–51 (1964) as holding that "allegations contained in criminal charge are absolutely privileged." *Di Blasio* holds no such thing. The defamation action in that case was based on the filing of a civil action for criminal conversation, which, despite its name, was a tort not a crime, in which a husband could recover civil damages against another man who had sexual intercourse with his (the plaintiff's) wife. Upon the adoption of Art. 46 of the Md. Declaration of Rights, the tort was effectively abolished by this Court as being in violation of that Article. *See Kline v. Ansell*, 287 Md. 585, 414 A.2d 929 (1980).

by such officials. *Williams v. Mayor & City Council of Baltimore,* 359 Md. 101, 137–39, 753 A.2d 41, 60–62 (2000); *Bradshaw v. Prince George's County,* 284 Md. 294, 302–03, 396 A.2d 255, 260–61 (1979). That immunity protects the officer from liability for non-malicious negligent conduct committed in the performance of discretionary acts in furtherance of the officer's official duties. *See Muthukumarana v. Montgomery County,* 370 Md. 447, 479, 805 A.2d 372, 391 (2002); *Lovelace v. Anderson,* 366 Md. 690, 704–05, 785 A.2d 726, 734 (2001); *James v. Prince George's County,* 288 Md. 315, 323, 418 A.2d 1173, 1178 (1980). As we recently reconfirmed in *Lee v. Cline,* 384 Md. 245, 258–59, 863 A.2d 297, 305 (2004), however, the Maryland common law qualified immunity enjoyed by public officials in the performance of discretionary acts "is quite limited and is generally applicable only in negligence actions or defamation actions based on allegedly *negligent* conduct." (Emphasis added). It does not apply to liability based on "most so-called 'intentional torts.'" *Id. See also DiPino v. Davis,* 354 Md. 18, 49, 729 A.2d 354, 370–71 (1999).

The complaint against appellees charges knowing, intentional, and malicious, not negligent, conduct. On those allegations, the complaint was not subject to dismissal on the basis of common law qualified immunity.

In addition to the common law qualified immunity, Baltimore City police officers enjoy an *indirect* statutory qualified immunity under LGTCA. In contrast to the protection afforded to State personnel under the State Tort Claims Act, Maryland Code, § 12–105 of the State Govt. Article and CJP § 5–522(b),[11] local government employees do not possess

---

11. State Govt. Article, § 12–105 provides that State personnel, a term that is defined in § 12–101, shall have the immunity from liability described under § 5–522(b) of the Courts and Judicial Proceedings Article. CJP § 5–522(b), in turn, provides that State personnel "are immune from suit in courts of the State and from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence, and for which the State or its units have waived immunity under Title

a direct immunity from liability for their tortious conduct under LGTCA. They may be sued, and judgments may be entered against them. The protection afforded by LGTCA is two-fold. If the action alleges that the conduct was within the scope of the defendant's employment, the local government must provide a legal defense for the employee. CJP § 5–302(a). In addition, unless the employee is found to have acted with actual malice, the plaintiff may not execute on a judgment recovered against the employee, CJP § 5–302(b), but, rather, subject to certain limits, the local government is liable on the judgment.[12] That protection may be broader than the common law immunity in that it does not appear to exclude liability for intentional torts, so long as they were committed within the scope of employment and without actual malice. Because of the construct of LGTCA, however, the complaint against appellees is not subject to dismissal by reason of this indirect statutory immunity. That immunity will have relevance only if a judgment is entered against appellees.

 Finally, we turn to the question of what immunity, if any, appellees have with respect to the alleged disclosure to the news media of defamatory averments in the warrant application. As noted, the complaint charges that "the false statements were leaked by the Defendants to members of the media for the express purpose of causing publication of the false statements."

 Surely, there is no *absolute* privilege or immunity for that kind of conduct; police officers cannot have a greater

---

12, Subtitle 1 of the State Government Article, even if the damages exceed the limits of that waiver." Subject to certain conditions and limitations, State Govt. Art., § 12–104 waives the State's sovereign immunity in tort actions. Under this construct, therefore, an action based on the tortious conduct of a State employee who qualifies as State personnel is against the State, not the employee.

**12.** Malice, in this context, means "an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate." *See Shoemaker v. Smith*, 353 Md. 143, 163–64, 725 A.2d 549, 560 (1999).

privilege to disseminate defamatory material to the news media than they have to include it in an application presented to a judge. Whether dissemination of defamatory material to the news media is protected by a *qualified* privilege depends on (1) whether it is part of the officer's official duties to make such a dissemination, and (2) whether the officer acts with malice in doing so.

To the extent there is a standard, it appears to be stated in Restatement (Second) of Torts, § 598A:

"An occasion makes a publication conditionally privileged if an inferior administrative officer of a state or any of its subdivisions who is not entitled to an absolute privilege makes a defamatory communication required or permitted in the performance of his official duties."

That standard was applied in *Rippett v. Bemis*, 672 A.2d 82 (Me.1996), a case that arose out of a publicized report by a convicted felon that the police had improperly returned to him a rifle that, due to his status as a convicted felon, he was not entitled to possess. A detective charged with investigating that claim appeared on television and reported that the charge was false, that the rifle had been given to the felon's wife, whereupon the wife sued for defamation. Reversing a summary judgment for the detective, the court adopted the principle stated in Restatement (Second) of Torts, § 598A. Noting that there was a departmental policy prohibiting public statements regarding departmental investigations, the Maine court concluded that there was at least a genuine issue of fact as to whether the detective's remarks were required or permitted in the performance of his official duties, and that made summary judgment inappropriate. The court went on to note, as does Comment a. to § 598A, that the conditional privilege may be lost by the publishers's knowledge or reckless disregard as to the falsity of the statements, or by the publication of the defamatory matter for some improper purpose.

A Kentucky court cited § 598A in holding that a police chief, accused of defaming another police officer by appearing on television and accusing the officer of being a racist, did not

enjoy an absolute privilege, but only a qualified one. *See Lanier v. Higgins,* 623 S.W.2d 914 (Ky.App.1981). The court noted that the chief was not involved in a judicial proceeding and that the communication was not made in the discharge of any statutory duty.

Massachusetts has been even less generous to police officers who make defamatory statements to the press. In *Draghetti v. Chmielewski,* 416 Mass. 808, 626 N.E.2d 862 (1994), a police chief was sued for defamation based on remarks he made to a newspaper reporter regarding an investigation into whether another police officer had violated certain ethical rules. Appealing a judgment for the plaintiff, the defendant claimed that, as police chief, he had a duty, and therefore a conditional privilege, to speak to the press about the matter. The Massachusetts Supreme Judicial Court rejected that defense, concluding that "a police chief has no official duty to report internal investigations to the press." *Id.* at 867. In those cases where the court had recognized a conditional privilege, the statements were made to "a narrow group who shared an interest in the communication." In none of them, the court said, were the defamatory statements made to a newspaper of general circulation. *Id. Compare Burke v. Town of Walpole,* 405 F.3d 66 (1st Cir.2005), where the U.S. Court of Appeals for the First Circuit concluded that Massachusetts would likely recognize a qualified privilege for statements made by a police chief to a group of concerned citizens.

Some guidance in this area may also be found in *Buckley v. Fitzsimmons,* 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). In that case, a prosecutor was sued under 42 U.S.C. § 1983 for (1) fabricating evidence during a lengthy investigation and eventually obtaining an indictment upon the presentation of that fabricated evidence to the grand jury, and (2) making false assertions, including of the fabricated evidence, at a press conference held to announce the indictment. The Court concluded that the prosecutor had only qualified immunity in both situations. As to the first, it viewed the prosecutor's role as more of an investigator than an advocate for the State and thus accorded the same qualified immunity that a

detective would have. As to the second, which is the more relevant here, the Court confirmed that "while prosecutors, like all attorneys, were entitled to absolute immunity from defamation liability for statements made during the course of judicial proceedings and relevant to them . . . most statements made out of court received only good faith immunity." *Id.* at 277, 113 S.Ct. at 2617–18, 125 L.Ed.2d at 228–29. Following the functional approach that it had previously taken with respect to privileges, the Court added that "[c]omments to the media have no functional tie to the judicial process just because they are made by a prosecutor" and that, although statements to the press "may be an integral part of a prosecutor's job" and "may serve a vital public function," they do "not involve the initiation of a prosecution, the presentation of the State's case in court, or actions preparatory for these functions." *Id,* at 277–78, 113 S.Ct. at 2617–18, 125 L.Ed.2d at 229.[13]

 We believe that the principle set forth in § 598A of the Restatement provides the proper balance. To the extent that a police officer may qualify as an "inferior administrative officer" of the State or a subdivision of the State, the officer has a qualified privilege to make a defamatory communication "required or permitted in the performance of his [or her] official duties." [14] That privilege, as we observed, is subject to being lost if it is abused—if the officer knows that the

---

**13.** In reaching that conclusion, the Supreme Court adopted the view that had previously been taken by most of the Federal Courts of Appeals. This Court has also adopted the functional approach in determining the issue of privilege. *See Gill v. Ripley,* 352 Md. 754, 770, 724 A.2d 88, 96 (1999); *Parker v. State,* 337 Md. 271, 287, 653 A.2d 436, 444 (1995).

**14.** We are, of course, aware that many police agencies have public information officials whose function it is it communicate with the news media. Whether ordinary police officers are required or permitted to engage in such communications in the furtherance of their official duties is a factual matter which, when relevant, must be pled and proved.

statements are false or makes them with reckless disregard of whether they are true or false, or makes them for some improper purpose.

## CONCLUSION

For the reasons noted, the judgment of the Circuit Court will be reversed and the case remanded for further proceedings. The complaint should not have been dismissed with prejudice. Ultimately, of course, in order to prevail in light of the constraints of *New York Times* and the common law and statutory immunities possessed by appellees, appellants will be required to prove, among other elements of the tort of defamation: (1) that the statements complained of were, indeed, false; (2) that appellees made the statements either knowing that they were false or with reckless disregard of whether they were true or false; (3) that they made the statements with actual common law malice—without justification or excuse and with an evil or rancorous motive influenced by hate; and (4) with respect to the communication to the news media, that appellees were neither required nor permitted to make such communications to the media in the performance of their official duties or did so for an improper purpose.

JUDGMENT OF CIRCUIT COURT FOR BALTIMORE CITY REVERSED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS; COSTS TO BE PAID BY APPELLEES.