*Timothy Everett Beall v. Connie Holloway-Johnson*, No. 17, September Term, 2015. Opinion by Harrell, J.

**APPEAL AND ERROR – EXTENT OF REVIEW**

The Court of Appeals reviews a circuit court's grant of a motion for judgment in a civil case without deference to the circuit court's decision. Questions of law, like the interpretation of the Local Government Torts Claims Act, are reviewed *de novo*.

**MUNICIPAL CORPORATIONS – LIABILITY OF OFFICERS OR AGENTS**

Under the Local Government Torts Claims Act (LGTCA), local government employees may be sued and judgments may be levied against them if the local government employee is found to have acted with actual malice and outside the scope of his or her employment.

**MUNICIPAL CORPORATIONS – DAMAGES**

A Baltimore City police officer defendant cannot waive, as to his employer, the Local Government Tort Claims Act (LGTCA)'s cap on damages that a plaintiff may seek from the police department. The LGTCA provisions do not constitute an affirmative defense that must be pled by a defendant before trial.

**TORTS –PUNITIVE DAMAGES**

Punitive damages are reserved for the most egregious torts and require proving malice by clear and convincing evidence. Because a *prima facie* case of battery or a violation of Article 24 of the Md. Declaration of Rights may be established without showing malice, it is improper to imply malice as a necessary element of these torts.

Circuit Court for Baltimore City
Case No. 24-C-11-002394
Argued: September 29, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 17

SEPTEMBER TERM, 2015

TIMOTHY EVERETT BEALL

v.

CONNIE HOLLOWAY-JOHNSON

Barbera, C.J.,
Battaglia,
Greene,
Adkins,
McDonald,
Harrell, Glenn T., Jr. (Retired, Specially
                              Assigned),
Cathell, Dale R., (Retired, Specially
                              Assigned),

JJ.

Opinion by Harrell, J.

Filed: January 21, 2016

This tragic case arose out of a motor vehicle collision between a Baltimore City police cruiser and a privately-owned motorcycle, resulting in the death of the motorcyclist. Respondent Connie Holloway-Johnson, on her own behalf and as the personal representative of the estate of her deceased son, Haines E. Holloway-Lilliston, initiated a wrongful death suit against, among others, Petitioner, Timothy Everett Beall, a Baltimore City police officer. The complaint, filed in the Circuit Court for Baltimore City, alleged negligence, gross negligence, battery, and a violation of Article 24 of the Maryland Declaration of Rights. Compensatory and punitive damages were sought.

At trial, Petitioner made a Motion for Judgment at the close of the Plaintiffs' case-in-chief. The Circuit Court (Hon. Marcus Z. Shar, presiding) granted the motion in part, allowing to go to the jury only the question of whether Officer Beall was negligent and, if so, what amount of compensatory damages should be awarded. The jury returned a substantial verdict for compensatory damages for Respondent, which amount was reduced subsequently by the trial judge, on Petitioner's motion, to $200,000 to comply with the damages "cap" of the Local Government Tort Claims Act ("LGTCA"), Maryland Code (1974, 2013 Repl. Vol.), Courts and Judicial Proceedings Article, § 5-301, *et seq.* ("CJP").

Respondent appealed to the Court of Special Appeals, which reversed the judgment in a reported opinion and remanded the case for a new trial. We granted Petitioner's Petition for a Writ of Certiorari to consider multiple questions regarding the partial grant of the Motion for Judgment, the availability for the jury to consider an award of punitive damages, and the applicability of the LGTCA.

**THE EVIDENCE ADMITTED DURING PLAINTIFFS' CASE-IN-CHIEF**

On 25 July 2010, Officer Timothy Beall was on duty in a marked police car in Baltimore City working the midnight patrol shift in the Northern District. He overheard a call on his radio from an off-duty officer about a Mercedes convertible and a motorcycle "chasing each other or racing each other" at about 100 miles per hour (m.p.h.) on Interstate 83 North (also known as the Jones Falls Expressway) in Baltimore City. A second transmission related that other officers were able to stop the car[1], but not the motorcycle.

Officer Beall, who was near the I-83 interchange with Cold Spring Lane at the time of the second transmission, turned onto I-83 North to see if he could "observe the motorcycle." As he was merging onto the Interstate, he noticed a motorcycle on I-83 northbound that was traveling at the time about 35 m.p.h. in a 50 m.p.h. zone. Unable to determine whether this was the same motorcycle as the one involved in the reported chase/race, Officer Beall followed the motorcycle in an attempt to ascertain license plate information. At approximately I-83 North's interchange with the Northern Parkway, the motorcycle sped-up to about 75 m.p.h., a speed in excess of the posted limit. Officer Beall noted that "[i]nitially I didn't have much reason to suspect that [the motorcycle] was stolen. But once the motorcyclist fled, that heightened my suspicion based on the extremely high rate of stolen motorcycles in the City of Baltimore that the bike may be

---

[1] The stopped car was a black Toyota.

stolen." After the operator of the motorcycle "popped a wheelie," Officer Beall turned on his siren and lights to pursue the motorcycle.[2]

The pursuit continued, at speeds of 75 m.p.h., onto the inner loop of Interstate 695 East (the Baltimore Beltway) in the direction of Towson. At the Charles Street interchange, the speed of the motorcycle reduced to the posted speed limit of 50 m.p.h.[3] As Officer Beall trailed the motorcycle, he received intermittent messages over his car's police radio. The messages were intermittent due to reception problems along portions of the route. Officer Beall denied hearing an initial direct radio order from his Shift Commander to discontinue pursuit of the motorcycle; he acknowledged, however, that he was advised indirectly thereafter to disengage from the pursuit after he was on I-695 East into Baltimore County. His Shift Commander stated over the radio "Yeah, have the officer disregard and come back, notify the state police of [the motorcyclist's] location,

---

[2] Officer Beall admitted that he knew of no any exigent circumstances to justify following or pursuing the motorcycle, a requirement of General Order 11-90 of the Baltimore City Police Department, which states:

> Members of this Department shall operate departmental vehicles with utmost care and caution, comply with all traffic laws and SHALL NOT BECOME ENGAGED IN HIGH-SPEED PURSUIT DRIVING, except under EXIGENT circumstances. Exigent circumstances consist of:
> - Instances where the officer determines that immediate action is necessary, and
> - Insufficient time exists to resort to other alternatives, and
> - Failure to pursue may result in grave injury or death

BCPD General Order 11-90 (emphasis in original).

[3] At the time, this portion of I-695 East was under construction, with a slightly lower speed limit than customary.

3

the radio is going to die out soon, if there are repeaters out there, so just come on back." Officer Beall responded to this by stating "10-4" (meaning "acknowledged"), turning off his lights and his siren, and planning to turn back to Baltimore City. At this time, Officer Beall called the State Police from his cell phone to inform them of his position and that he had followed a motorcycle from Baltimore City onto I-695 East.

Officer Beall followed the motorcycle onto the exit ramp for Dulaney Valley Road. He explained that he chose this exit, rather than the closer Lutherville/Timonium exit, because "[t]he next exit [he] was familiar with was Dulaney Valley Road to go south, which [would take him] right down to Northern Parkway from York Road." On the exit ramp, the motorcyclist reduced his speed to between 31 and 33 m.p.h. Officer Beall was traveling at about 40 m.p.h. The police cruiser made contact with the motorcycle. The motorcyclist, later identified as Holloway-Lilliston, was ejected from the bike.[4] His body made contact with the hood of Officer Beall's car. He died upon

---

[4] State Police Sergeant Jon McGee's accident reconstruction report stated this about the accident:

> It was my opinion that the police cruiser made contact with its front left corner to the rear tire of the motorcycle causing the motorcycle to be pushed/driver out from underneath Mr. [Holloway-]Lilliston. Mr. [Holloway-]Lilliston landed on the police cruiser's hood before falling off the left side of the hood. The police cruiser then drove partially over the motorcycle with its front left corner/tire; which in turn, caused the damage to the underside of the front left side of the police cruiser to include ripping away the front left plastic wheel well cover. Mr. [Holloway-]Lilliston fell off the left side of the police cruiser and landed on the left side of the exit ramp and slid to his final rest position as the cruiser slowed to a stop.

hitting the pavement. State Police Sergeant Jon McGee, an expert witness in accident reconstruction, offered his opinion about how the collision occurred:

> So based off all the evidence, it's my opinion that there was contact between the two vehicles, and at that time Mr. Holloway[-Lilliston], based on that contact, the bike would have went out from Mr. Holloway[-Lilliston]. When he came down, he came down on the hood of the police car. My initial assessment on the scene was that the speeds of both vehicles were low. I estimated probably the police maybe 40. And I knew the speed differential between the two vehicles, because there was no inward crush damage to the bumper, was significantly low, maybe 5 to 10, 15 mile an hour speed difference, with the police car obviously going slightly faster than the motorcycle. Based off of where the initial tire marks and scratch marks of where the motorcycle went down and the location of where Mr. Holloway[-Lilliston] fell to the road and slid to final rest, and the damage associated with the front hood of the police car, it's my opinion that there was contact. Mr. Holloway[-Lilliston] fell onto the top of the police car, rolled off the left side. Based on the helmet damage, the circumference of the helmet, there were scratches pretty much the entire circumference of the helmet, landed head first as he rolled off the hood and slid to final rest.

Sergeant McGee concluded that "Officer Beall failed to maintain a safe and proper following distance when he collided into the rear of the motorcycle driven by Mr. [Holloway-]Lilliston."

On 6 April 2011, Holloway-Lilliston's mother, Connie Holloway-Johnson, filed a complaint against Officer Timothy Beall and the Mayor and City Council of Baltimore City in the Circuit Court for Baltimore City. The complaint alleged counts of negligence, gross negligence, battery, and a violation of Article 24 of the Maryland Declaration of Rights. Ms. Holloway-Johnson sought compensatory and punitive damages in the sum of $20 million. Prior to trial, she dismissed voluntarily her claims against the City and proceeded to a jury trial against Officer Beall.

The case was tried between 24 July 2012 and 3 August 2012. At the close of the Plaintiffs' case, Officer Beall made a Motion for Judgment on the basis that insufficient evidence was presented as to each of the claims. Judge Shar granted Officer Beall's motion as to the battery, gross negligence, and Article 24 claims, as well as the prayer for punitive damages. The only claims that were allowed to go to the jury were the negligence claim and the prayer for compensatory damages. On 3 August 2012, the jury returned a verdict in favor of Ms. Holloway-Johnson and the estate of her son for $3,505,000. On 20 August 2012, Officer Beall filed a Motion for a New Trial or to Revise the Judgment by reducing the verdict to conform to the damages "cap" in the Local Government Tort Claims Act (LGTCA). The Circuit Court reduced the judgment to $200,000, in accordance with the LGTCA. Ms. Holloway-Johnson appealed timely to the Court of Special Appeals.

The Court of Special Appeals held, in a reported opinion, that there was sufficient evidence for each of Ms. Holloway-Johnson's claims to have been submitted to the jury and that it was error for the Circuit Court to have granted Officer Beall's Motion for Judgment. Additionally, the intermediate appellate court determined that, although the evidence adduced would not justify under the gross negligence count an award of punitive damages, the battery and Article 24 counts could qualify as "predicates for punitive damages" under a theory of "malice implicit" in the elements of each cause of action. *Holloway-Johnson v. Beall*, 220 Md. App. 195, 227, 103 A.3d 720, 739 (2014). The Court held that the applicability of the LGTCA (which was not raised until Officer Beall's post-verdict motion) and its cap on damages was a "furiously contested moot

6

question," concluding that, under the provisions of the LGTCA, any potential cap on damages could not be waived by Officer Beall as to his local government employer, who would be liable for the judgment (up to the limit of the LGTCA "cap").

On 27 March 2015, we granted a writ of certiorari, *Holloway-Johnson v. Beall*, 442 Md. 194, 112 A.3d 373 (2015), to consider five questions (posed by the parties in their respective petitions), which we reorganize and condense as follows[5]:

1) Did the Court of Special Appeals modify improperly established standards to conclude that there was sufficient evidence to support the counts for gross negligence, battery, and a violation of Article 24?

---

[5] The parties' questions were framed as:

1) Did the CSA err when it held that the "malice implicit" in Petitioner's actions could support an award of punitive damages, contrary to the long-established law that actual, not implied, malice is needed for an award of punitive damages? (Officer Beall's petition)

2) Did the CSA improperly modify the established definition of the "intent" needed to support claims for battery and for a physical contact in violation of Article 24 of the Md. Declaration of Rights, when it determined that the evidence was sufficient to present the claims to the jury? (Officer Beall's petition)

3) Did the CSA improperly conclude that there was sufficient evidence to support claims for gross negligence, battery and violation of Article 24 when the record was devoid of facts to show intent on the part of Petitioner to cause a collision? (Officer Beall's petition)

4) Did the CSA err by affirming the judgment as to negligence but remanding for further proceedings on the claims for gross negligence, battery and violation of Article 24, thus allowing the pursuit of multiple recoveries of compensatory damages for the single claim arising from the collision? (Officer Beall's petition)

5) Did [Officer Beall] waive the damages cap and judgment avoidance afforded by the Local Government Tort Claims Act, having failed to raise the defense until after trial and entry of judgment? (Ms. Holloway-Johnson's cross-petition)

7

2) Did the Court of Special Appeals err when it held that Respondent's counts could support an award of punitive damages, contrary to the long-established law that actual, not implied, malice was necessary and remanding the case for further proceedings which might result also in the award of duplicative compensatory damages?

3) Did Officer Beall waive the damages cap and judgment avoidance afforded by the Local Government Tort Claims Act, having failed to raise the defense until after trial and entry of judgment?

Although we agree with the Court of Special Appeals as to the sufficiency of the evidence as to the counts for which the trial court gave judgment in favor of Officer Beall at the close of Ms. Holloway-Johnson's case-in-chief and on the LGTCA question, we reverse nonetheless the judgment of the Court of Special Appeals for reasons we shall explain.

## DISCUSSION

### I. Sufficiency of the Evidence

#### a. Contentions

Officer Beall contends that the Circuit Court's grant of his Motion for Judgment as to the Respondent's claims for battery, gross negligence, violation of Article 24, and punitive damages was correct because there was insufficient evidence admitted during the Plaintiffs' case-in-chief to support submitting them to the jury. Proceeding from that premise, he asserts further that the Court of Special Appeals erred in reversing this judgment and remanding the case for a new trial when the admitted evidence amounted to no more than speculation about his intent at the time of the collision. Ms. Holloway-Johnson responds that she adduced enough evidence at trial to have all of her claims

8

submitted to the jury and that the Court of Special Appeals was correct to reverse the grant of judgment in favor of Officer Beall. Additionally, she maintains that the Court of Special Appeals applied correctly the malice requirement for consideration of awarding punitive damages to conclude that her battery and Article 24 claims could support implicitly such an award.

### b. Standard of Appellate Review

We "review, without deference, the trial court's grant of a motion for judgment in a civil case." *District of Columbia v. Singleton*, 425 Md. 398, 406, 41 A.3d 717, 721 (2012) (citing *Thomas v. Panco Mgmt. of Md., LLC,* 423 Md. 387, 393–94, 31 A.3d 583, 587–88 (2011)). Because "[w]e conduct the same analysis that a trial court should make when considering the motion for judgment," we determine whether the evidence presented to the Circuit Court was sufficient to allow permissible inferences of the proof of the elements of the relevant claims. *Singleton*, 425 Md. at 406-07, 41 A.3d at 721-22. The appellate court considers "the evidence and reasonable inferences drawn from the evidence in the light most favorable to the non-moving party." *Thomas,* 423 Md. at 393, 31 A.3d at 587.

### c. Analysis

As stated earlier, Judge Shar allowed the jury to consider only the negligence count and the compensatory damages claim because he deemed all of Ms. Holloway-Johnson's other claims to be lacking sufficient evidentiary support. The Court of Special Appeals disagreed, finding that there was sufficient evidence for all of Ms. Holloway-Johnson's counts to reach the jury, as well as her request for punitive damages. Viewing

the evidence in the light most favorable to the non-moving party (including reasonable inferences drawable therefrom), we agree in the abstract with the Court of Special Appeals as to the counts, but, as we shall explain, reversal and remand for a new trial to consider those claims and possibly punitive damages is unwarranted in the context of this case.

A motor tort negligence claim presents ordinarily a relatively low bar for a plaintiff to overcome and avoid the grant of a motion for judgment. Negligence is defined as "any conduct, except conduct recklessly disregardful of an interest of others, which falls below the standard established by law for protection of others against unreasonable risk of harm." *Barbre v. Pope*, 402 Md. 157, 187, 935 A.2d 699, 717 (2007) (citation omitted). A claim for gross negligence, however, sets the evidentiary hurdle at a higher elevation:

> [G]ross negligence is an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them. Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist.

*Id.* (citations omitted). The distinction between negligence and gross negligence, however, can be a difficult one to establish in practice, as explained by the Court of Special Appeals in this case – "[a] legally sufficient case of ordinary negligence will frequently be enough to create a jury question of whether such negligence was or was not gross." *Holloway-Johnson*, 220 Md. App. at 221, 103 A.3d at 735.

10

*Boyer v. State,* 323 Md. 558, 594 A.2d 121 (1991), involved a state trooper's high-speed pursuit of a suspected drunk driver, which resulted in the death of other motorists. The plaintiffs claimed that the trooper was grossly negligent because he pursued recklessly a suspect "at an excessively high rate of speed through a heavy traffic area." *Boyer*, 323 Md. at 579, 594 A.2d at 132 (quotation marks omitted). We explained that, "[i]n order to charge [the trooper] with gross negligence, the plaintiffs must have pled *facts* showing that [the trooper] acted with a wanton and reckless disregard for others in pursuing [the suspect]." *Boyer*, 323 Md. at 579, 594 A.2d at 132 (emphasis in original). We held that the facts advanced by the plaintiffs were too vague to demonstrate adequately that the trooper acted in a grossly negligent manner because a rational fact-finder could not conclude that the trooper acted with "wanton or reckless disregard for the safety of others in pursuing [the suspect]." *Boyer*, 323 Md. at 580-81, 594 A.2d at 132.

In *Barbre*, we held that, when a police officer "ordered [the suspect], who was unarmed, to raise his hands, and that after [the suspect] complied with the request, [the police officer] approached with his gun drawn and shot him in the neck, [those facts] could support an inference that [the police officer] acted grossly negligent." *Barbre*, 402 Md. at 190, 935 A.2d at 719. Comparing and contrasting *Boyer* and *Barbe*, it is apparent that determining if a plaintiff has adduced sufficient evidence of gross negligence to get to a jury can be a complex question due to the sometimes close relationship between ordinary negligence and gross negligence. *See Barbre*, 402 Md. at 187, 935 A.2d at 717 ("Issues involving gross negligence are often more troublesome than those involving

11

malice because a fine line exists between allegations of negligence and gross negligence.").

Here, Officer Beall argues that the evidence (viewed in a light most favorable to the Plaintiffs) did not show he was grossly negligent (or permit a reasonable inference of such) in acting "wantonly and willfully [by inflicting the] injury intentionally." *Barbre*, 402 Md. at 187, 935 A.2d at 717. To be sure, the evidence presented at trial by the Plaintiffs revealed contradictory accounts by Officer Beall about how the incident unfolded. With only one surviving eyewitness, other direct evidence of what occurred was minimal. Although Ms. Holloway-Johnson's complaint alleged that Officer Beall "intended to harm Haines," Officer Beall notes that Sergeant McGee "did not offer any testimony that this accident was the result of intentional conduct by Officer Beall."

The evidence presented by Ms. Holloway-Johnson strikes us as stronger than the conclusory record in *Boyer*. In *Boyer,* the plaintiff offered general allegations that the behavior of the trooper was reckless and in violation of police procedures. Ms. Holloway-Johnson relied specifically, however, on the actions of Officer Beall prior to the collision to show that he was acting recklessly. Officer Beall commenced trailing the motorcycle surreptitiously and started active pursuit only after Holloway-Lilliston "popped a wheelie" and sped away. Officer Beall's conduct concededly was in violation of BCPD General Order 11-90 (*see* discussion *supra* fn.2) as he was acting without exigent circumstances in his pursuit of Holloway-Lilliston, who committed only traffic offenses and posed no articulated immediate harm to others. Additionally, evidence was presented to show that Holloway-Lilliston reduced his speed upon entering the

12

construction zone on I-695 East; yet, Officer Beall continued to follow him in contravention of a directive from his Shift Commander to discontinue pursuit and allow the State Police to handle the "traffic incident."

Because "we have viewed gross negligence, rather, 'as something *more* than simple negligence, and likely more akin to reckless conduct,'" there was a factual dispute that should have been presented ordinarily to the jury. *Barbre*, 402 Md. at 187, 935 A.2d at 717 (citing *Taylor v. Harford County Dep't of Soc. Servs.,* 384 Md. 213, 229, 862 A.2d 1026, 1035 (2004) (emphasis in original)). Here, based on the accident reconstruction that surmised the over-taking speed of the police cruiser on the ramp, the lack of exigent circumstances justifying Officer Beall's pursuit, and Officer Beall's testimony (as an adverse witness called by Ms. Holloway-Johnson) that he saw Holloway-Lilliston apply his brakes on the exit ramp, a jury could have inferred reasonably that Officer Beall knew or should have known a collision between the vehicles was likely.

Ms. Holloway-Johnson relied on the same evidence for her battery claim, which required proof that "one intends a harmful or offensive contact with another without that person's consent." *Nelson v. Carroll*, 355 Md. 593, 600, 735 A.2d 1096, 1099 (1999) (citing Restatement (Second) of Torts § 13 & cmt. d (1965)). The contact may be direct or indirect, but it must be intended. *Nelson*, 355 Md. at 600-01, 735 A.2d at 1099-100. It is clear that "[a] person can use an automobile or other vehicle to intentionally hit another person," but, in order for that to constitute civil battery, the element of intent must be present. *Hendrix v. Burns*, 205 Md. App. 1, 22, 43 A.3d 415, 428 (2012). This intent "requires not a specific desire to bring about a certain result, but rather a general intent to

13

unlawfully invade another's physical well-being through a harmful or offensive contact or an apprehension of such a contact." *Nelson*, 355 Md. at 602-03, 735 A.2d at 1101.

Accordingly, accidental conduct that "inadvertently results in a harmful or offensive contact with another will not give rise to liability, but one will be liable for such contact if it comes about as a result of the actor's *volitional conduct* where there is an intent to invade the other person's legally protected interests." *Nelson*, 355 Md. at 603, 735 A.2d at 1101 (emphasis supplied). Although a plaintiff is required to adduce admissible facts as to each element of a claim in order to reach the jury, it is well-established that "intent is a subjective element usually left for the jury's determination [and] there are circumstances under which the law will imply the intent element of an intentional tort or a crime." *Id.*

Following the accident, Officer Beall made conflicting statements to investigators that the motorcycle darted in front of him on the ramp, that Holloway-Lilliston crashed his motorcycle, and his body bounced off a tree, among other claims.[6] Notwithstanding Officer Beall's differing after-the-fact accounts, his violation of the BPCD General Order and disregarding his Shift Commander's verbal directive were clearly intentional acts. It

---

[6] These statements go only to Officer Beall's general credibility because they do not bear directly on Officer Beall's intent at the time of the collision. As noted by Judge Cathell during oral argument before us, there is a difference between saying "I know I've done something wrong" and "I intended to do something wrong." This distinction was mentioned during a portion of oral argument addressing the false exculpatory statements made by Officer Beall after the collision. Although lying after the collision is not sufficient to establish that Officer Beall intended maliciously at the time to strike and kill Holloway-Lilliston, it does provide some insight into the Officer's state of mind right after the incident and his motivation to prevaricate.

14

is clear further that contact was made between the two vehicles by Officer Beall's vehicle overtaking the motorcycle. Thus, Ms. Holloway-Johnson presented legally sufficient evidence to permit a rational jury to conclude that a battery occurred on the exit ramp, which led to the collision, and was intentional.

By the same token, the evidence could have been viewed by a reasonable fact-finder as supporting a claim for a violation of Article 24 of the Maryland Declaration of Rights. Article 24[7] is Maryland's equivalent due process provision, determined to "have the same meaning and effect in reference to an exaction of property, and that the decisions of the Supreme Court on the Fourteenth Amendment are practically direct authorities." *Bureau of Mines of Maryland v. George's Creek Coal & Land Co.*, 272 Md. 143, 156, 321 A.2d 748, 755 (1974). The analysis for an Article 24 violation follows the analysis used for claims under the Fourteenth Amendment to the United States Constitution and, as a result, "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, . . . should be analyzed under the Fourth Amendment['s] 'reasonableness' standard." *Okwa v. Harper*, 360 Md. 161, 204, 757 A.2d 118, 141 (2000) (quoting *Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871 (1989)).

---

[7] Article 24 of the Maryland Declaration of Rights states: "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

Officer Beall relies on *County of Sacramento v. Lewis*, 523 U.S. 833, 839, 118 S. Ct. 1708, 1713 (1998), in which the United States Supreme Court was asked to "resolve a conflict among the Circuits over the standard of culpability on the part of a law enforcement officer for violating substantive due process in a pursuit case." The Supreme Court determined that "a police officer [does not violate] the Fourteenth Amendment's guarantee of substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender." *County of Sacramento*, 523 U.S. at 836, 118 S. Ct. at 1711. Only "a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." *County of Sacramento*, 523 U.S. at 836, 118 S. Ct. at 1711-12. Although this case might support Officer Beall's argument to the jury (had he been called upon to address the jury on this count) that he did not violate Article 24, it bears on the burden of persuasion once the claim is presented to the fact-finder, who would evaluate the evidence to determine if the standard was met. It does not aid his argument regarding the sufficiency of the Plaintiffs' evidence via a vis his motion for judgment at the close of the Plaintiffs' case-in-chief.

As held by this Court, "if there is any evidence adduced, however slight, from which reasonable jurors [applying the appropriate standard of proof] could find in favor of the plaintiff on the claims presented, the trial court should deny the defendant's motion for judgment at the close of the evidence and submit the claims to the jury for decision." *Hoffman v. Stamper*, 385 Md. 1, 16, 867 A.2d 276, 285 (2005). After reviewing the

16

evidence in the light most favorable to the non-moving party, Ms. Holloway-Johnson, we arrive at the same technical conclusion as the Court Special Appeals: the defense's motion for judgment based on the alleged insufficiency of the Plaintiffs' evidence should not have been granted on that ground. Our decision does not address whether a jury would find for Ms. Holloway-Johnson on these claims. We are concerned only with whether she adduced enough evidence on each element of contested, but withheld, substantive causes of action to have a jury consider them. We conclude that she did, but, as we shall explain now, this appellate "victory" is a pyrrhic one.

## II. Compensatory and Punitive Damages

The compensatory damages verdict Respondent received from the jury on her negligence claim represents all of the compensatory relief due under any or all of the causes of action advanced. Moreover, none of the withheld claims would support submitting the punitive damage request to the jury. Accordingly, a new trial is not warranted.

Compensatory damages are awarded in an "attempt to make the plaintiff whole again by monetary compensation." *Exxon Mobil Corp. v. Albright*, 433 Md. 303, 414, 71 A.3d 30, 97 *on reconsideration in part,* 433 Md. 502, 71 A.3d 150 (2013) and *cert. denied,* 134 S. Ct. 648, 187 L. Ed. 2d 449 (2013). We have noted that, although compensatory damages are awarded to make a plaintiff whole, "they are not intended to grant to the plaintiff a windfall as a result of the defendant's tortious conduct. Thus, an award for compensatory damages must be anchored to a rational basis on which to ensure that the awards are not merely speculative." *Exxon Mobil Corp*, 433 Md. at 414, 71 A.3d at 98.

Maryland law provides that "a plaintiff is entitled to but one compensation for her loss and that satisfaction of her claim prevents further action against another for the same damages." *Underwood-Gary v. Mathews*, 366 Md. 660, 667, 785 A.2d 708, 712 (2001) (citation omitted). The "purpose of the rule is to prevent double recovery and, thus, unjust enrichment." *Id.* Under the Maryland rules, "[d]ifferent legal theories for the same recovery, based on the same facts or transaction, do not create separate 'claims.'" *East v. Gilchrist*, 293 Md. 453, 459, 445 A.2d 343, 346 (1982). Because it is common for a plaintiff to plead multiple claims or theories of recovery for the same incident, we clarified that "[w]hat makes claims separate is *not* whether they are pled in separate counts or embody separate legal theories." *Med. Mut. Liab. Ins. Soc. of Maryland v. B. Dixon Evander & Assocs.*, 331 Md. 301, 313, 628 A.2d 170, 176 (1993). Additionally, we explained:

> [W]here a claimant presents a number of legal theories, but will be permitted to recover on at most one of them, his possible recoveries are mutually exclusive, and he has but a single claim for relief. The existence of multiple claims ultimately depends upon whether the "aggregate of the operative facts" presented states more than one claim which can be separately enforced.

*Med. Mut. Liab. Ins. Soc. of Maryland*, 331 Md. at 309, 628 A.2d at 174 (citations and quotations omitted).

For a plaintiff to have his or her "claims" considered separate claims for purposes of separate compensatory damage awards, the injuries must have arisen from separate, unique transactions; otherwise, the multiple "claims" are essentially different legal theories premised on a single set of facts. Here, Ms. Holloway-Johnson's multiple claims all arise from the same set of facts and, therefore, she would have been entitled to but one

18

compensatory recovery. The gross negligence, battery, and Article 24 violation claims were but different legal theories under which a jury could have awarded compensatory damages. Consequentially, Ms. Holloway-Johnson received a complete compensatory damages award for the negligence claim.

We turn next to the matter of punitive damages. The Court of Special Appeals analyzed correctly in this regard the lack of significance of the negligence and gross negligence claims. The elements of neither tort claim would support submission to a jury of a prayer for punitive damages. *Owens-Illinois, Inc. v. Zenobia*, 325 Md. 420, 601 A.2d 633 (1992) "held that 'implied malice,' to wit, gross negligence, would not qualify as a predicate for punitive damages." *Holloway-Johnson*, 220 Md. App. at 226-27, 103 A.3d at 739. We disagree, however, with the intermediate appellate court's reasoning that the claims for battery or the Article 24 violation could serve as a predicate for a punitive damage award, without actual proof of malice. Our appellate colleagues concluded that "malice implicit" in the foundational elements of these two intentional torts would be sufficient to allow a jury to consider an award of punitive damages, even in the absence of additional proof of actual malice; we do not reach the same conclusion.

Punitive damages are reserved typically for punishing the most heinous of intentional torts and tortfeasors. Such damages are only "awarded in an attempt to punish a defendant whose conduct is characterized by evil motive, intent to injure, or fraud, and to warn others contemplating similar conduct of the serious risk of monetary liability." *Zenobia*, 325 Md. at 454, 601 A.2d at 650. We explained that "negligence alone, no matter how gross, wanton, or outrageous, will not satisfy [the] standard [of actual

19

malice]." *Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 264, 841 A.2d 828, 837 (2004) (citing *Zenobia,* 325 Md. at 463, 601 A.2d at 654). The evidence "must show malicious conduct and not simply. . . negligence" in order to justify an award of punitive damages. *Zenobia*, 325 Md. at 465, 601 A.2d at 655.

Reliance on an embedded "malice implicit" in the elements of the intentional torts of the battery and Article 24 violations claims pushes our jurisprudence on punitive damages too far. To support a claim for punitive damages, "in *any* tort case[,] a plaintiff must establish by clear and convincing evidence the basis for an award of punitive damages." *Zenobia*, 325 Md. at 469, 601 A.2d at 657. In "a non-intentional tort action, the trier of facts may not award punitive damages unless the plaintiff has established that the defendant's conduct was characterized by evil motive, intent to injure, ill will, or fraud, *i.e.,* 'actual malice.'" *Zenobia*, 325 Md. at 460, 601 A.2d at 652 (footnote omitted). We apply this same principle for intentional torts because, even if a plaintiff makes-out a *prima facie* case of an intentional tort by a preponderance of the evidence, a plaintiff must be able to show additionally, to a clear and convincing standard, that the tort was committed with "actual malice."

By implying that malice is embedded within proof (by a preponderance standard) of the elements of battery and an Article 24 violation, the Court of Special Appeals whistles by an important part of the actual malice requirement. A civil battery may be committed without actual malice. In those cases, adducing a *prima facie* case for battery would not support submitting a punitive damages prayer to the fact-finder. The intent required for proof of a battery claim "requires not a specific desire to bring about a certain result, but

20

rather a general intent to unlawfully invade another's physical well-being through a harmful or offensive contact or an apprehension of such a contact." *Nelson*, 355 Md. at 602-03, 735 A.2d at 1101. This does not equate implicitly or necessarily to actual malice, which requires more than the general intent necessary to prove a civil battery. It requires proof of a specific intent to injure the plaintiff. Because we have restricted punitive damage awards to cases where the conduct is "characterized by knowing and deliberate wrongdoing," a standard of "malice implicit" would expose inappropriately defendants to punitive damages without requiring a plaintiff to prove actual malice and the required specific intent to injure by clear and convincing evidence. *Darcars Motors of Silver Spring, Inc.*, 379 Md. at 265, 841 A.2d at 837.

Article 24 claims may be established also without proving actual malice necessarily. We apply the Fourth Amendment reasonableness standard (*see* discussion *supra* at 15) when we evaluate a claim for a violation of Article 24. We "take the perspective of a reasonable officer on the scene of the incident at issue and pay close attention to the particular facts of each case." *Okwa*, 360 Md. at 204, 757 A.2d at 141. In a case involving a question of qualified immunity for State Police troopers, the Court of Special Appeals, relying on our decision in *Okwa*, stated that "a police officer acting without malice may be liable for using excessive force in an arrest, in violation of Article 24 of the Maryland Declaration of Rights." *Tavakoli-Nouri v. State*, 139 Md. App. 716, 734, 779 A.2d 992, 1003 (2001). Therefore, it is possible for an officer to be found in violation of Article 24 without proof of malice.

21

Because "a judge must not allow the jury to consider the issue of 'actual malice'" unless the evidence of malice is clear and convincing, and it is possible for a civil battery and an Article 24 violation to be proven without showing malice necessarily, it would be improper for a trial court to imply routinely malice in these counts based purely on a determination that a *prima facie* case of each claim was established by a preponderance of the evidence. *See Darcars Motors of Silver Spring, Inc.*, 379 Md. at 270, 841 A.2d at 841 (But, "where a defendant commits a tort with 'actual malice,' a jury may award the plaintiff punitive damages").[8]

The Court of Special Appeals did not analyze the Plaintiffs' evidence for proof of actual malice because it concluded that malice was implicit in the elements of battery and for violation of Article 24. Because we determine that clear and convincing evidence of malice and the specific intent to injure must be adduced before a jury is allowed to consider an award of punitive damages, our examination of Plaintiffs' evidence leads us to conclude that Ms. Holloway-Johnson would not be entitled to have the question of an

---

[8] The Court of Special Appeals was correct to point out that:

> an award of punitive damages requires the satisfaction of a much higher burden of persuasion than does the establishment of the base tort itself, but that higher burden of persuasion does not involve appellate review of the legal sufficiency of the evidence to take the issue to the jury. It involves the burden of persuasion and not the burden of production.

*Holloway-Johnson v. Beall*, 220 Md. App. 195, 227, 103 A.3d 720, 739 (2014). This does not change, however, our decision because a plaintiff is still required to produce evidence of actual malice before any request for punitive damages should be presented to a jury for consideration.

award of punitive damages submitted to the jury because she did not produce clear and convincing evidence of actual malice on the part of Officer Beall. Respondent argues that because Officer Beall admitted that he "pursued" the motorcycle onto the ramp, without exigent circumstances and at least 10 m.p.h. over the speed limit, in violation of the General Order and contrary to his Shift Commander's directive, an intent to injure was shown or was inferable. This evidence showed, however, only that Officer Beall's actions were intentional, not that the actions were malicious.

Ms. Holloway-Johnson argues further that Officer Beall's admission that he saw Holloway-Lilliston's brake lights on the ramp before the collision occurred and Sergeant McGee's conclusion that Officer Beall did not apply his brakes were evidence of actual malice or, at the very least evidence of Officer Beall's consciousness of wrong-doing. The theme of consciousness of wrong-doing pervaded Respondents' oral arguments before us, based primarily on the false exculpatory statements made by Officer Beall involving his "theory" of the collision. Officer Beall's various post-hoc accounts of how the collision occurred (*see* discussion *supra* fn.6), and his radioed statement after the collision that he "found this guy up here," go undoubtedly to his credibility as a witness and his appreciation of his negligence. It would not allow, however, for a reasonable inference that these statements reflected Officer Beall's intent at the time of the collision. Respondents' reliance also on Officer Beall's failure to apply his brakes on the exit ramp (after seeing the motorcycle's brake lights) do not support an inference of actual malice because there was no evidence on the record to show that Officer Beall was aware of the

speed differential between the two vehicles or that he intended to injure or harm Holloway-Lilliston by "closing the gap."

No evidence was produced by Ms. Holloway-Johnson to establish directly or by reasonable inference that Officer Beall was acting with malicious intent during the pursuit or that he had a specific intent - to harm Holloway-Lilliston on the exit ramp.[9] Based on the evidence before the Circuit Court, Officer Beall's conduct could have been regarded as reckless or grossly negligent, but not conduct undertaken with actual malice. Without evidence from which a reasonable jury could find or infer actual malice, even had the battery and Article 24 claims survived the close of Plaintiffs' case-in-chief, Ms. Holloway-Johnson would not be entitled to punitive damages and therefore a remand is unwarranted.

### III.     Local Government Tort Claims Act (LGTCA)

#### a. Contentions

Ms. Holloway-Johnson contends that the Court of Special Appeals erred in approving the trial court's application of the LGTCA's compensatory damages "cap" to the jury verdict regarding the negligence count because Officer Beall failed to raise

---

[9] *Compare Heinze v. Murphy*, 180 Md. 423, 432-33, 24 A.2d 917, 922 (1942) (holding that there was no evidence of malice because the police officer did not know the plaintiff, "there ever was any reason for ill will," and the officer conducted himself becomingly as an officer of the law endeavoring to do his duty as he understood it to be") *with French v. Hines*, 182 Md. App. 201, 221, 957 A.2d 1000, 1011 (2008) (discussing the inconsistency of a jury award of punitive damages without a finding of actual malice, when presented with evidence that the plaintiff bent over to get her purse at a traffic stop (only to be faced with the officer's drawn gun), testimony that her head was slammed into the side of the truck, and that the "handcuffs were deliberately too tight").

timely application of the LGTCA. She contends that the LGTCA is an affirmative defense and therefore must be pled before a verdict is rendered. Officer Beall responds that the Court of Special Appeals held correctly that he could not waive his employer's protection under the LGTCA, because the LGTCA is not an affirmative defense, and that Ms. Holloway-Johnson's arguments have no support in Maryland law.

### b. Standard of Review

Ms. Holloway-Johnson's question is one of legislative interpretation, a question of law. Consequentially, we accord no deference to the lower courts' decisions here. *White v. Pines Cmty. Improvement Ass'n, Inc.*, 403 Md. 13, 31, 939 A.2d 165, 175 (2008); s*ee Gebhardt & Smith LLP v. Maryland Port Admin.*, 188 Md. App. 532, 564, 982 A.2d 876, 894 (2009).

### c. Analysis

The Court of Special Appeals provided an exhaustive analysis of the LGTCA. *See Holloway-Johnson*, 220 Md. App. at 207-18, 103 A.3d at 727-34. We agree with that analysis.

As noted aptly by the intermediate appellate court, "the LGTCA was designed to provide a remedy for persons injured by local government employees, who often have limited resources from which an injured person might collect on a judgment." *Holloway-Johnson*, 220 Md. App. at 212, 103 A.3d at 730-31. "Baltimore City police officers enjoy an *indirect* statutory qualified immunity under LGTCA [but] do not possess a direct immunity from liability for their tortious conduct under LGTCA. They may be

sued, and judgments may be entered against them." *Smith v. Danielczyk*, 400 Md. 98, 129-30, 928 A.2d 795, 814 (2007).

Because the LGTCA does not allow a plaintiff to bring suit directly against the local government, the suit is brought against the employee. Even so, "a person may not execute against an employee on a judgment rendered for tortious acts or omissions committed by the employee within the scope of employment with a local government [unless] it is found that the employee acted with actual malice."[10] CJP § 5-302(a)-(b). If the employee is found to have acted with actual malice, the employee is liable fully for any damages awarded in the suit. CJP § 5-302 (b).[11]

---

[10] Actual malice, for purposes of the LGTCA, is defined as "ill will or improper motivation." Maryland Code (1974, 2013 Repl. Vol.), Courts and Judicial Proceedings Article, § 5-301(b) ("CJP").

[11] The LGTCA acts to protect local government employees in multiple ways:

> If the action alleges that the conduct was within the scope of the defendant's employment, the local government must provide a legal defense for the employee. CJP § 5–302(a). In addition, unless the employee is found to have acted with actual malice, the plaintiff may not execute on a judgment recovered against the employee, CJP § 5–302(b), but, rather, subject to certain limits, the local government is liable on the judgment. That protection may be broader than the common law immunity in that it does not appear to exclude liability for intentional torts, so long as they were committed within the scope of employment and without actual malice. Because of the construct of LGTCA, however, the complaint . . . is not subject to dismissal by reason of this indirect statutory immunity. That immunity will have relevance only if a judgment is entered against [the party protected by the LGTCA].

*Smith v. Danielczyk*, 400 Md. 98, 130, 928 A.2d 795, 814 (2007) (footnote omitted).

Of specific concern here, CJP § 5-301(d)(21) makes clear that, under the LGTCA, the Baltimore City Police Department (BCPD) is considered a local government entity and that "[f]or purposes of tort law, however, it has been since 1997 a 'local government' and, as such, the tort liability of its employees is governed by the LGTCA." *Holloway-Johnson*, 220 Md. App. at 212, 103 A.3d at 730. Therefore, because the BCPD is covered by the LGTCA, the question of whether a waiver of the statute's protections occurred in this case must be answered. We agree with the Court of Special Appeals that LGTCA protection could not be waived by Officer Beall because it was not his to waive. Because the evidence was not sufficient to prove that Officer Beall had acted with actual malice (and he was operating within the scope of his employment), the LGTCA cap applied.

> As discussed by the Court of Special Appeals, in a case such as we have here,
>
> whether the judgment be for $10,000 or $10 million, an injured party may not collect so much as one penny from the employee directly, so long as the employee is acting without malice and within the scope of his employment. Although the judgment is nominally against the employee, it is as a practical matter frequently meaningless as applied against the employee. No action is required by the employee to protect himself, except to cooperate in the defense of the action. Even then, such action need consist only of explaining to the court that the judgment is subject to the LGTCA and that the plaintiff may not execute against him.

*Holloway-Johnson*, 220 Md. App. at 213-14, 103 A.3d at 731. Because this case implicates clearly the LGTCA, Respondent is entitled only to collect up to the damages

cap of $200,000[12] from the local government, the amount she received after the Circuit Court reduced the verdict awarded by the jury.[13] Even though we conclude that Ms. Holloway-Johnson's additional substantive claims perhaps should not have been withheld from the jury ordinarily, because the single injury-single recovery of compensatory damages were "capped" by the LGTCA as to the award on her negligence claim and no additional damages would be available to her had the other counts been submitted to the jury, it serves no purpose to remand for a new trial. Therefore, we affirm in part and reverse in part the judgment of the Court of Special Appeals, and remand with directions to reinstate the judgment of the Circuit Court.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE SPLIT EQUALLY BY PETITIONER AND RESPONDENT.**

---

[12] As of 1 October 2015, CJP § 5-303(a) provides that "the liability of a local government may not exceed $400,000 per an individual claim, and $800,000 per total claims that arise from the same occurrence for damages resulting from tortious acts or omissions, or liability arising under subsection (b) of this section and indemnification under subsection (c) of this section." At the time the verdict in this case was returned and the verdict reduced, the relevant amounts were $200,000 per individual claim and $500,000 per total claims, but the statute was no less clear. The most Respondent could receive was $200,000 under CJP § 5-303(a), which, regardless of our assessment of the error in not submitting to the jury the additional claims, would not have allowed her to recover duplicative compensatory damages, as feared by Petitioner.

[13] The local government is not liable for punitive damages under the LGTCA. *See* CJP § 5–303(c)(1).